**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**JOSHUA LEE GRANT,**

      **Plaintiff,**

**vs.**                            **CIVIL ACTION NO. 3:18-CV-00482**

**NANCY A. BERRYHILL,
ACTING COMMISSIONER OF
SOCIAL SECURITY,**

      **Defendant.**

**<u>PROPOSED FINDINGS AND RECOMMENDATION</u>**

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. By Order entered March 27, 2018 (ECF No. 4), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court is the Plaintiff's ***<u>Memorandum in Support of Judgment on the Pleadings</u>*** (ECF No. 15) and the Defendant's ***<u>Brief in Support of Defendant's Decision</u>***. (ECF No. 16)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **GRANT** Plaintiff's request for judgment on the pleadings to the extent he requests remand (ECF No. 15), **DENY** Defendant's request to affirm the decision of the Commissioner (ECF No. 16); **REVERSE** the final decision of the Commissioner and **REMAND** for further proceedings pursuant to sentence four of 42

U.S.C. § 405(g); and **DISMISS** this action from the docket of the Court for the reasons stated *infra*.

**Procedural History**

The Plaintiff, Joshua Lee Grant (hereinafter referred to as "Claimant"), protectively filed his application for Title XVI benefits on August 14, 2014, alleging disability beginning January 1, 2014 due to "depressive disorder, asthma, and mild mental retardation."[1] (Tr. at 210) His claim was initially denied on December 5, 2014 (Tr. at 112-116) and again upon reconsideration on February 26, 2015. (Tr. at 120-122) Thereafter, Claimant filed a written request for hearing on April 3, 2015. (Tr. at 123-125)

An administrative hearing was held on March 15, 2017 before the Melinda Wells, Administrative Law Judge ("ALJ"). (Tr. at 70-89) On March 30, 2017, the ALJ entered an unfavorable decision. (Tr. at 17-33) On May 26, 2017, Claimant sought review by the Appeals Council of the ALJ's decision.[2] (Tr. at 269-270) The ALJ's decision became the final decision of the Commissioner on February 6, 2018 when the Appeals Council denied Claimant's Request for Review. (Tr. at 1-7)

On March 26, 2018, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2) In response, the Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 10 and 11) Subsequently, Claimant filed a Memorandum in Support of Judgment on the Pleadings (ECF No. 15), in response, the Commissioner filed a Brief in Support of Defendant's Decision

---

[1] Claimant also alleged that he stopped working on July 31, 2014 because "they told me i could not do the work." (Tr. at 210)

[2] Counsel for Claimant inquired as to the status of his claim and resubmitted the brief in support of the Request for Review on December 7, 2017. (Tr. at 186-188)

(ECF No. 16), to which Claimant later filed his Reply. (ECF No. 17) Consequently, this matter is fully briefed and ready for resolution.

## Claimant's Background

Claimant was 19 years old when he filed his application for benefits and considered a "younger person" throughout the underlying proceedings. See 20 C.F.R. § 416.963(c). (Tr. at 28) Claimant graduated from high school and attended special education classes. (Tr. at 211) He worked at the Goodwill in a two-month disability program and worked for two months at Target; his last job was at McDonald's which lasted a week. (Tr. at 76)

## Standard

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 416.920. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant

work. Id. § 416.920(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).

The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. § 416.920(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." Id. § 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. § 416.920a(c). Those sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in

4

which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to subpart P of part 404 of this chapter for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. See 12.00E of the Listing of Impairments in appendix 1 to subpart P of part 404 if this chapter.

(4) When we rate your degree of limitation in these areas (understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself), we will use the following five-point scale: None, mild, moderate, marked, and extreme. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. § 416.920a(d)(1). Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. § 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. § 416.920a(d)(3). The Regulations further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in

reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. § 416.920a(e)(4).

## Summary of ALJ's Decision

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since August 14, 2014, the application date. (Tr. at 22, Finding No. 1) Under the second inquiry, the ALJ found that Claimant suffered from the following severe impairments: borderline intellectual functioning; dysthymic disorder; and schizoid personality disorder. (Id., Finding No. 2) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 23, Finding No. 3) The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with the following nonexertional limitations:

> he can perform simple, routine, repetitive tasks; make simple work-related decisions; occasionally interact with supervisors and coworkers; and never interact with the public. He is able to respond appropriately to occasional changes in a work setting. He requires hands on demonstration of tasks and repetition of instructions throughout the first one to two days on a new job.

(Tr. at 24, Finding No. 4) At step four, the ALJ found Claimant had no past relevant work. (Tr. at 28, Finding No. 5) At the fifth and final step, the ALJ found that Claimant was 19 years old when he filed his application, making him a younger individual; that he had at least a high school education and able to communicate in English; that the transferability of job skills was immaterial to the determination of disability because he had no past relevant work; and that based on his age, education, work experience, and RFC, there are other jobs that exist in significant numbers in the

6

national economy that Claimant can perform. (Id., Finding Nos. 6-9) The ALJ determined that

Claimant had not been under a disability since August 14, 2014. (Tr. at 29, Finding No. 10)

**Claimant's Challenges to the Commissioner's Decision**

Claimant argues that the ALJ erred by failing to consider Claimant's intellectual

impairment under § 12.05B despite finding he had a severe impairment at step three. (ECF No. 15

at 8-10) Claimant asserts that the ALJ impermissibly gave more weight to the IQ scores Claimant

achieved in November 2014 and April 2015 even though they were consistent with his January

2012 score pursuant to the DSM-V; Claimant's IQ scores satisfied the first subsection of Listing

12.05B. (Id. at 10-12)

Next, Claimant contends the ALJ did not properly perform the adaptive functioning

analysis addressed by this Court in Hardway v. Colvin, No. 2:14-cv-7339, 2015 WL 1057956

(S.D.W. Va. 2015). (Id. at 12-13) The ALJ herein did not reconcile Claimant's abilities and

disabilities under the Listing 12.05B rubric where the evidence demonstrated that he met the

Listing because he had deficits in adaptive functioning prior to age 22. (Id. at 13-14) Further,

Claimant contends that the ALJ's RFC assessment is contrary to the evidence showing that

Claimant could not function independently and further, conflicts with the opinion of Tammy

Corbett-Alderman, Psy.D. that he would require a more restrictive and supportive job environment

that is akin to an accommodated or special supervision work setting. (Id. at 15)

Because the evidence shows Claimant's impairment met all the criteria under Listing

12.05B, the ALJ's errors below were not harmless, as he would be entitled to a disability finding.

(Id. at 16) The final decision is not based upon substantial evidence, and Claimant asks this case

be reversed and remanded for an award of benefits or for a correction of the errors made below.

(Id. at 17)

In response, the Commissioner argues that Claimant is incorrect as a matter of law insofar as Claimant's intellectual impairment would be analyzed under Listing 12.05B – the revised rules provided that borderline intellectual functioning is evaluated under Listing 12.11. (ECF No. 16 at 5-6) With respect to Claimant's argument that the ALJ should have relied upon an earlier IQ test score, the Commissioner states that this test was administered when Claimant was 15 years old, and further, the ALJ appropriately relied upon Claimant's subsequent diagnosis of borderline intellectual functioning after the results of the subsequent IQ tests were obtained. (Id. at 7-8) The Commissioner argues that for the ALJ to do otherwise would be contrary to established law and would further require the ALJ to ignore the medical evidence. (Id. at 7, n.6) In addition, the Commissioner points out that this Court has recognized that an ALJ may weigh IQ test results, and further, both the Regulations and the Commissioner's Program Operations Manual System ("POMS") recognize that IQ scores from children younger than 16 are not always consistent over time.[3] (Id. at 8-9)

Next, the Commissioner argues that despite the inapplicability of Listing 12.05B, Claimant failed to show that his impairment even met the criteria of 12.05B2 which is identical to the requirements set forth under 12.11B2; further, Claimant's borderline intellectual functioning failed to meet all the criteria of Listing 12.11B. (Id. at 10-11)

The Commissioner asserts that the Hardway case is unavailing here because the ALJ herein did address Claimant's adaptive functioning, which included a discussion about Claimant's academic history, and that the evidence showed that he did not rely upon others to assist him with

---

[3] See Reynolds v. Colvin, No. 13-22604, 2014 WL 4852242, at *19 (S.D.W. Va. Aug. 19, 2014) (citations omitted); Owens v. Astrue, No. 11-148, 2012 WL 4499067, at *9 (S.D.W. Va. Sept. 28, 2012). (ECF No. 16 at 8)

his activities of daily living. (Id. at 11) The Commissioner also points out that the Hardway case predated the 2017 rules changes, and that in a more recent case, this Court addressed the changes in assessing adaptive functioning which concerns typical functioning at home and in the community, alone or among others. See Huffman v. Berryhill, No. 16-710, 2017 WL 1375218, at *5 (S.D.W. Va. Apr. 14, 2017). (Id. at 12) In this case, the ALJ thoroughly discussed the evidence which demonstrated Claimant did not have significant deficits in his adaptive functioning, but showed he only had moderate limitations in the four areas of mental functioning. (Id. at 12-15)

The Commissioner states that the ALJ's decision is supported by substantial evidence and asks the Court to affirm her final decision. (Id. at 16)

In reply, Claimant begins that he did not concede that borderline intellectual functioning was the correct diagnosis and points out that the summarized evidence supported a diagnosis for mild mental retardation. (ECF No. 17 at 1) Next, Claimant argues that the Commissioner's own comments to the revision of the Listings criteria is not diagnosis-driven, but is function-driven, thus, the ALJ's evaluation of Claimant's borderline intellectual functioning under Listing 12.11 is contrary to the Regulations. (Id. at 2) Further, the Regulations explicitly provide for evaluating IQ scores under Listing 12.05, wherein the Commissioner's own commentary recognizes that the medical community accepts that there is a standard margin of error on these tests, therefore, Claimant's IQ scores from 2011, 2014 and 2015 were within that standard margin of error; in addition, Claimant's IQ scores satisfied Paragraph B requirements of Listing 12.05. (Id. at 3)

Claimant also disagrees with the Commissioner's argument that his IQ score from when he was fifteen and a half years old is deserving of less weight and points out that the Commissioner's reliance on Reynolds v. Colvin is entirely misplaced because the facts from that

case are wholly distinguishable from the one at bar. (Id. at 3-4) Claimant points out that Reynolds did not adopt a bright line rule that IQ scores obtained prior to the age of sixteen are not probative and even the Regulations provide that IQ scores tend to stabilize by the age of sixteen. (Id. at 4)

Finally, Claimant contends that the Commissioner's discussion of Hardway v. Colvin and Huffman v. Berryhill misses the point of this appeal: Listing 12.00H provides that an adjudicator must engage in a comprehensive analysis that considers a claimant's strengths and deficits in adaptive functioning as well as a claimant's ability to sustain everyday activities independently. (Id. at 4-5) In this case, the ALJ failed to do this comprehensive analysis as required by Listings 12.00 and 12.05, therefore the step three finding is unsupported by substantial evidence. (Id. at 5)

Remand is necessary to correct this legal error. (Id.)

**The Relevant Evidence of Record**[4]

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

Records Related to Intellectual Functioning:

The administrative record included three sets of valid standardized intelligence testing from January 2011 (Tr. at 326), November 2014 (Tr. at 365-664), and April 2015 (Tr. at 380-381). In January 2011, at age fifteen and a half, Claimant obtained a full-scale I.Q. score of 68 (Tr. at 326), and in November 2014, at age 19, he obtained a full-scale I.Q. score of 72 (Tr. at 365). During testing in November 2014, Claimant was found to read at the 4.3 grade level and to perform math skills at a 6.8 grade level (Tr. at 366); repeated testing in April 2015 yielded a full-scale IQ score of 72 (Tr. at 380) and that he could read at the 4.2 grade level, but his math performance fell to the equivalent of

---

[4] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

3.2 grade level. (Tr. at 381)

Records Related to Adaptive Functioning:

The administrative record begins with a psychiatric hospitalization in December 2011 after Claimant experienced an outburst of anger against his brother and threatened suicide. (Tr. at 272-278) Claimant's father reported similar outburst on several prior occasions but had been unable to calm Claimant during this most recent episode. (Tr. at 272) Claimant was diagnosed with depressive disorder and mild mental retardation. (Id.) In follow-up treatment notes in June and August 2012, Claimant was noted to continue to experience contentious relationships and ongoing symptoms, although he denied wanting to hurt himself. (Tr. at 284-287)

Claimant attended school under an Individual Education Plan ("IEP") that provided one-to-one instruction and additional explanation and time to complete assignments. (Tr. at 303) It was noted that Claimant appeared "to be independent in various daily living skills and is able to ask for assistance when necessary." (Id.) Claimant expressed interest in attending a carpentry program at the local career center; however, vocational testing suggested he may struggle in this field, specifically with regard to performing the mathematical functions, language skills, and reasoning level required. (Id.) His teacher and caregiver completed a Vineland II report regarding adaptive behavior, which indicated Claimant's adaptive behavior composite to be in the moderately low to low range and less developed than those of the same aged peers. (Tr. at 326)

On April 9, 2015, Claimant underwent a psychological evaluation by Wendy Manns, M.A., supervised by Tammy Corbett-Alderman, Psy.D. (Tr. at 377-383) He was referred by his physician due to anger control issues. (Tr. at 377) During the evaluation, Claimant reported problems with anger control, low frustration tolerance, and irritability, as well as poor social skills, isolative

11

behavior, and lack of comfort in group settings. (Tr. at 377-378) Claimant was noted to have no appropriate peer relationships and moved to his aunt's home after graduating from high school with a modified diploma. (Tr. at 378) Claimant described a recent incident during which he had stabbed his mother's boyfriend, which the record documented to be in self-defense with no charges filed. (Id.)

He reported that he was unable to maintain employment at McDonald's because of his difficulties with following instructions. (Tr. at 379) Claimant was described as having a depressed mood and sad affect, immature social skills, impaired social reciprocity, and limited eye contact (Id.)

Recommendations included individual therapy to address depressive symptomology and poor self-image, pro social physical activity, social skills training as well as vocational training. (Tr. at 382) It was noted that Claimant "would function best in a highly structured environment with predictable, explicitly delineated expectations, performing tasks, which are quantifiable and repetitive." (Tr. at 382-383) "In any occupational setting, he will require regular supervision and positive reinforcement." (Tr. at 383)

Subsequently, Claimant began treatment with Alderman and Associates in April 2015 and continued through the relevant time period. (Tr. at 384-385, 388-397, 399-402, 423-428)

Throughout the counseling notes, Claimant is often noted to have significant adaptive behaviors, such as being shy, quiet, withdrawn, difficult to engage in discussion, and lacking desire for family or social relationships. (Tr. at 384-385, 395-396, 401, 423, 427) Treatment records document avoidance of social interactions and difficulties with anger, irritability, and lashing out at others. (Tr. at 385, 389-391, 395, 423) Records indicate that Claimant occasionally reported

12

suicidal and/or homicidal ideations. (Tr. at 394, 395, 428) On March 8, 2017, Claimant's aunt reported a significant decline in his functioning, stating that he had to be told when and how to do things, including basic hygiene. (Id.)

**The Administrative Hearing**

Claimant Testimony:

Claimant testified he lived in a house with his aunt. (Tr. at 74) He explained that he had attempted to obtain a driver's license three times but was unable to pass the written portion of the test. (Id.) He stated he had a high school education and attended special education classes that included one-on-one assistance in every subject. (Tr. at 74-75) Claimant indicated he could read on a second or third grade level and could write but could not sign his name in cursive. (Tr. at 75) He stated he had a checking account but was unable to manage money on his own. (Tr. at 75-76)

Claimant testified that he had worked at Goodwill for two months as part of a disability program and also had attempted work at Target and McDonald's. (Tr. at 76) He stated he was unable to work due to pain in his legs. (Id.) He explained he had been injured during a basketball game and received physical therapy, but one leg is now skinnier than the other, and on bad days, it would ache and throb. (Tr. at 76, 78) He described the pain as constant and was made worse with walking. (Tr. at 76-77) He stated ibuprofen made it a "little bit" better. (Tr. at 77) He confirmed he did not wear a splint or brace but did use cold packs about two times a week. (Tr. at 78)

Claimant had difficulty answering questions about his previous hospitalizations, although he indicated he had been in the hospital for wanting to hurt someone, and also stated he had been in the hospital for 10 days, however, he did not understand the ALJ's questions regarding suicide. (Tr. at 79) He stated he attended counseling about every two weeks (Id.) and took only Benadryl – no

13

prescription medications. (Tr. at 77-78)

Claimant testified he could walk about a block-and-a-half before needing to rest; he stated he could sit without limitation and could lift a laundry basket of clothes. (Tr. at 79) He admitted to having difficulty listening to and comprehending others, had problems with his memory, and was easily distracted. (Tr. at 80) Claimant stated he did not have problems getting along with others (Id.) but later admitted that if someone corrected him or told him to do better at work, he would have a problem with that person. (Tr. at 82)

Claimant stated that he took baths when his aunt prompted him. (Tr. at 81) He stated he helped with the laundry, but sometimes did not do it right. (Id.) He stated he usually did not go shopping but sometimes went with his grandmother to get clothes. (Id.) He stated he played basketball about two to three times per month. (Id.) On a typical day, Claimant stated he watched television and played video games and spent time with family. (Tr. at 81-82) He stated he did not use a computer and did not have a phone. (Tr. at 82)

Claimant testified that his interaction with others was generally limited to contact with his aunt. (Id.) He confirmed that he preferred not to talk to other people. (Tr. at 83)

Anthony Michael, Vocational Expert ("VE") Testimony:

The VE confirmed Claimant had no past relevant work (Tr. at 84) and indicated Claimant could perform work at all exertional levels under the ALJ's controlling hypothetical RFC. (Tr. at 84-85) The VE stated that 98 percent of work would not allow for an individual to never interact with co-workers and/or the public – one narrow exception being night cleaner. (Tr. at 86) The VE confirmed that an individual who worked at a slower pace or rate than all other employees would eventually be terminated from unskilled jobs. (Tr. at 87) Likewise, the VE indicated that an

individual who needed instructions repeated on a weekly basis would require accommodated work or special supervision. (Tr. at 88)

## Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." Blalock, 483 F.2d at 775.

## Analysis

Claimant's primary argument in this appeal concerns that the ALJ should have evaluated Claimant's adaptive functioning under Listing 12.05 instead of 12.11. As an initial matter, there is no dispute that the rules regarding the Listings and how certain mental disorders are to be evaluated

changed effective January 17, 2017, and that these new rules apply to Claimant's petition.[5] There

is also no dispute regarding the ALJ's step two findings concerning Claimant's severe impairments,

including borderline intellectual functioning. From the *Revised Medical Criteria for Evaluating*

*Mental Disorders*, the SSA provides the following:

> The Role of Listing 12.11
>
> Although prior listing 12.05 included a capsule definition that was very similar to the medical definition of intellectual disability, the capsule definition did not indicate how significant the claimant's subaverage general intellectual functioning and deficits in adaptive functioning had to be. For example, other mental impairments, such as specific learning disability and ***borderline intellectual functioning***, can involve subaverage general intellectual functioning and deficits in adaptive functioning, as well as evidence that the disorder initially manifested during the developmental period. However, claimants with impairments such as specific learning disability and ***borderline intellectual functioning*** do not have the same nature or degree of subaverage intellectual functioning and deficits in adaptive functioning as people with intellectual disability.
>
> The reorganization of listing 12.05 will mean that cognitive impairments other than intellectual disability will not meet the listing criteria for 12.05. ***We will use final listing 12.11, neurodevelopmental disorders, to evaluate these impairments.*** Section 12.00B9, which is the section of the introductory text that describes this listing, explains that ***we evaluate impairments such as specific learning disorder and borderline intellectual functioning under listing 12.11.*** This listing furthers our goal to identify claimants with disabling impairments accurately, reliably, and as early in the sequential evaluation process as possible.

(emphasis added)

Pursuant to Section 12.00B9, titled "neurodevelopmental disorders (12.11)", the

Regulations state as follows:

> a. These disorders are characterized by ***onset during the developmental period, that is, during childhood or adolescence***, although sometimes they are not diagnosed until adulthood. Symptoms and signs may include, but are not limited to, underlying abnormalities in cognitive processing (for example, deficits in

---

[5] These rules apply to "new applications filed on or after the effective date of the rules, and to claims that are pending on or after the effective date." See *Revised Medical Criteria for Evaluating Mental Disorders*, 81 FR 66138, 2016 WL 5507752, at *1.

learning and applying verbal or nonverbal information, visual perception, memory, or a combination of these); deficits in attention or impulse control; low frustration tolerance; excessive or poorly planned motor activity; difficulty with organizing (time, space, materials, or tasks); repeated accidental injury; and deficits in social skills. Symptoms and signs specific to tic disorders include sudden, rapid, recurrent, non-rhythmic, motor movement or vocalization.

b. Examples of disorders that we evaluate in this category include *specific learning disorder, borderline intellectual functioning*, and tic disorders (such as Tourette syndrome).

c. This category does not include the mental disorders that we evaluate under neurocognitive disorders (12.02), autism spectrum disorder (12.10), or personality and impulse-control disorders (12.08).

(emphasis added)

As directed by the revised rules, Claimant's severe impairment, borderline intellectual functioning, is evaluated under Listing 12.11.[6][7] The undersigned appreciates Claimant's argument regarding the Commissioner's comments in the Federal Register[8] that "our mental disorders

---

[6] It is noted that since January 17, 2017, an "intellectual disorder" is evaluated under Listing 12.05, and "may be described in the evidence as intellectual disability, intellectual development disorder, or historically used terms such as 'mental retardation.' " See 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(B)(4)(b). The undersigned notes that Claimant's discharge summary from River Park Hospital in December 2011 indicated a diagnosis of "mild mental retardation", in addition to "depressive disorder, NOS" and "asthma" (Tr. at 272), and Claimant's education records document a "Specific Learning Disability" (Tr. at 300), however, the record of evidence, including reports from the psychological consultants and treatment notes from Claimant's therapist do not mention "intellectual disorder" that would justify evaluation under Listing 12.05.

[7] Claimant has argued that the ALJ's failure to evaluate his impairments under Listing 12.05B ignores the fact that his deficits in adaptive functioning occurred prior to age 22 (ECF No. 14 at 13-15), however, as shown under Listing 12.11, the Regulations expressly provide that the mental disorders to be evaluated under this Listing are "characterized by onset during the developmental period", that is, prior to age 22. Moreover, the ALJ found that Claimant was 19 years old as of the application date, therefore, she was obviously aware that his adaptive functioning deficits occurred prior to age 22.

[8] As pointed out by Claimant, this reference was made with respect to the proposed change in the name of Listing 12.05:

Regarding the request to ensure that adjudicators respect "a valid diagnosis of 'intellectual disability,' " we did not adopt this comment. It has been our experience that *there can be considerable variability in the quality of reports of psychological examinations and intelligence testing*. Moreover, *our mental disorders listings are function-driven, not diagnosis-driven*. To address this situation, and for the reasons explained in other sections of the preamble, we believe that the revision to listing 12.05 is a simpler, more effective approach to evaluating intellectual disability. The three elements that define "intellectual disability" are the three criteria in listing 12.05. We do not use the word "diagnosis" in the rules related to the listing.

See, 81 FR 66138, 2016 WL 5507752, at *29. (emphasis added)

listings are function-driven, not diagnosis-driven", however, had the ALJ evaluated Claimant's adaptive functioning under 12.05, she would have had to blatantly ignore the express language in the Regulations. Further, the record of evidence did not demonstrate "considerable variability in the quality of reports of psychological examinations and intelligence testing" that might have justified such a deviation from the Regulations. Finally, the ALJ would also have to ignore the gravamen of the record of evidence, including the diagnoses provided by Claimant's therapists and State agency psychological consultants did not include "intellectual disorder" to have triggered an evaluation under Listing 12.05. Therefore, the ALJ did not err by evaluating Claimant's borderline intellectual functioning under this Listing. Accordingly, the undersigned **FINDS** that Claimant's argument to this extent lacks merit.

<u>Evaluating Borderline Intellectual Functioning Under Listing 12.11:</u>

The Regulations provide that Listing 12.11 is satisfied when all of the criteria of paragraphs A and B are met:

A. Medical documentation of the requirements of paragraph 1, 2, or 3:
   1. *One* or both of the following:
      a. Frequent distractibility, difficulty sustaining attention, and difficulty organizing tasks; or
      b. Hyperactive and impulsive behavior (for example, difficulty remaining seated, talking excessively, difficulty waiting, appearing restless, or behaving as if being "driven by a motor").
   2. Significant difficulties learning and using academic skills; or
   3. Recurrent motor movement or vocalization.

AND

B. Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning (see 12.00F):
   1. Understand, remember, or apply information (see 12.00E1).
   2. Interact with others (see 12.00E2).
   3. Concentrate, persist, or maintain pace (see 12.00E3).
   4. Adapt or manage oneself (see 12.00E4).

18

20 C.F.R. pt. 404, subpt. P, app. 1, § 12.11 (*italics* in original).

To better explain these Paragraph B requirements, the Regulations provide additional guidance:

> 1. *Understand, remember, or apply information (paragraph B1).* This area of mental functioning refers to the abilities to learn, recall, and use information to perform work activities. Examples include: Understanding and learning terms, instructions, procedures; following one- or two-step oral instructions to carry out a task; describing work activity to someone else; asking and answering questions and providing explanations; recognizing a mistake and correcting it; identifying and solving problems; sequencing multi-step activities; and using reason and judgment to make work-related decisions. These examples illustrate the nature of this area of mental functioning. We do not require documentation of all of the examples.
>
> 2. *Interact with others (paragraph B2).* This area of mental functioning refers to the abilities to relate to and work with supervisors, co-workers, and the public. Examples include: cooperating with others; asking for help when needed; handling conflicts with others; stating own point of view; initiating or sustaining conversation; understanding and responding to social cues (physical, verbal, emotional); responding to requests, suggestions, criticism, correction, and challenges; and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness. These examples illustrate the nature of this area of mental functioning. We do not require documentation of all of the examples.
>
> 3. *Concentrate, persist, or maintain pace (paragraph B3).* This area of mental functioning refers to the abilities to focus attention on work activities and stay on task at a sustained rate. Examples include: Initiating and performing a task that you understand and know how to do; working at an appropriate and consistent pace; completing tasks in a timely manner; ignoring or avoiding distractions while working; changing activities or work settings without being disruptive; working close to or with others without interrupting or distracting them; sustaining an ordinary routine and regular attendance at work; and working a full day without needing more than the allotted number or length of rest periods during the day. These examples illustrate the nature of this area of mental functioning. We do not require documentation of all of the examples.
>
> 4. *Adapt or manage oneself (paragraph B4).* This area of mental functioning refers to the abilities to regulate emotions, control behavior, and maintain well-being in a work setting. Examples include: Responding to demands; adapting to changes; managing your psychologically based symptoms; distinguishing between acceptable and unacceptable work performance; setting realistic goals; making plans for yourself independently of others; maintaining personal hygiene and attire appropriate to a work setting; and being aware of normal hazards and taking

appropriate precautions. These examples illustrate the nature of this area of mental functioning. We do not require documentation of all of the examples.

Id. § 12.00E (*italics* in original).

With respect to the four areas of mental functioning, the Regulations provide a five-point rating scale. Id. § 12.00F2. In order to satisfy the paragraph B criteria, Claimant's mental disorder must result in extreme limitation in one, or marked limitation in two of the four areas of mental functioning:

a. No limitation (or none). You are able to function in this area independently, appropriately, effectively, and on a sustained basis.
b. Mild limitation. Your functioning in this area independently, appropriately, effectively, and on a sustained basis is slightly limited.
c. Moderate limitation. Your functioning in this area independently, appropriately, effectively, and on a sustained basis is fair.
d. Marked limitation. Your functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited.
e. Extreme limitation. You are not able to function in this area independently, appropriately, effectively, and on a sustained basis.

Id. In this case, the ALJ explicitly found that Claimant's mental impairments "do not meet or medically equal the criteria of listings 12.04, 12.08, or 12.11." (Tr. at 23)

With regard to the first category of functioning under paragraph B, the ALJ found that Claimant had a moderate limitation: he did not need reminders to take care of his personal needs, grooming or to take medication; he can count change; his hobbies include playing video games; and he does not have a driver's license because he was unable to pass the written test.[9] (Tr. at 23)

With regard to the second category, the ALJ found that Claimant had a moderate limitation because he indicated he has trouble getting along with others, he lives with his aunt, shops in stores

---

[9] The ALJ referenced Claimant's testimony and Exhibit 3E, Claimant's function report (Tr. at 217-224). The undersigned notes that Claimant indicated in his function report that his aunt reminds him to take his medication. (Tr. at 219)

and goes out alone, although he is social with friends and family on a regular basis. (Id.) Despite "some social deficits" in the record, the ALJ noted that Claimant visits with his cousin to play video games, plays basketball and hangs out with friends frequently, which the ALJ determined "indicates his social skills are sufficient to deal with individuals with whom he has become familiar such as supervisors and coworkers."[10] (Id.)

In the third category, the ALJ found Claimant's limitations were moderate, and referring to his testimony and function report, noting that he "attended regular education classes in school, but had extra help in reading and math", and that he graduated from high school, played video games "which requires some ability to concentrate and he watches television and does not report any problems following a program." (Id.) The ALJ also acknowledged that although Claimant had a checking account, his aunt manages his money. (Id.)

In the fourth and final category, the ALJ found that Claimant had moderate limitations, noting from his testimony and function report that he is able to manage his personal care needs without significant limitation, although he needs some encouragement to do household chores; the ALJ acknowledged that Claimant reported difficulty getting along with others and cannot handle stress or changes in routine well due to getting easily agitated, however, the ALJ determined that Claimant "has a fair ability to get along with authority figures and has never been fired or laid off from a job because of problems getting along with other people." (Tr. at 23-24) The ALJ further recognized that although Claimant attempted to work at several jobs, he "quit working each job because he was bored or did not like the job." (Tr. at 24)

_____

[10] Again, the ALJ referenced Claimant's testimony, function report as well as his self-reported social functioning described in the evaluation report from psychologist Angela Null dated November 25, 2014. (Tr. at 368)

In addition to finding that the "paragraph B" criteria were not met, the ALJ acknowledged that "no State agency psychological consultant concluded that a mental listing is medically equaled." (Id.)

In light of Claimant's argument that the ALJ failed to perform the adaptive functioning analysis, the ALJ's written decision acknowledges that Claimant's "intellectual functioning appeared below average based on previous school testing which showed his IQ in the high 60s[]" and compared this with "[s]ubsequent[] mental status exam findings note the claimant's concentration, recent and remote memory was intact. His intellectual functions were average and insight and judgement good."[11] (Tr. at 25, 284, 286, 288, 291-293) With respect to Claimant's history of depression, the ALJ addressed Claimant's hospitalization for threatening suicide and receiving additional mental health treatment by way of counseling. (Id.)

The ALJ reviewed the evidence in greater detail when assessing Claimant's RFC, including Claimant's academic history, noting his difficulties in reading and math, having graduated high school with an Individualized Education Plan ("IEP") in all subjects, and that he is unable to read big words in a newspaper. (Tr. at 25) Further addressing Claimant's educational records, the ALJ noted that he graduated high school and attended regular classes with a GPA of 2.36, that in addition to having received an IEP for his special learning disabilities, Claimant's full scale IQ score was 68 when he was 16 years old showing "poor adaptive functioning scores." (Id.) The ALJ also noted that a teacher report dated October 2014 indicated Claimant demonstrated "ongoing progress" and despite his difficulties with comprehension of reading material and with writing, "he was able to do so when provided additional time as allowed by his IEP. In addition, records

---

[11] The ALJ referenced the outpatient medical records from Huntington Behavioral Health from January through August 2012.

note the claimant could usually complete math assignments after additional clarification and more explanation was provided." (Tr. at 25-26, 295, 300, 301)

The ALJ compared Claimant's earlier IQ score of 68 with the more recent testing results from the psychological evaluation in November 2014 that indicated a full scale IQ score of 72.[12] (Tr. at 26) Testing revealed that Claimant could read and spell at the fourth grade level and perform math at the sixth grade level. (Id.) He showed deficits in judgment and insight, psychomotor behavior and pace were mildly slow, but his mental status exam was within normal limits. (Id.) The ALJ further acknowledged that the evaluation results indicated Claimant had mildly deficient social functioning and that he was assessed with dysthymic disorder and borderline intellectual functioning. (Tr. at 26, 367-368.)

The ALJ also addressed the psychological evaluation report provided by Tammy Corbett-Alderman, Psy.D, described *supra*. (Tr. at 26, 377-385) The ALJ noted Dr. Alderman's findings, which concluded that Claimant's full scale IQ score indicated "borderline range of intellectual functioning" and that "additional treatment in the way of individual therapy, social skills training,

---

[12] Although Claimant's argument centers on the ALJ's failure to analyze his adaptive functioning under Listing 12.05, which has already been determined to be inapplicable to Claimant's mental impairments based on the clear intent in the revised rules, *supra*, the undersigned addresses whether the ALJ's analysis is sufficient under Listing 12.11. Additionally, with respect to Claimant's arguments that his IQ scores satisfied the requirements under Listing 12.05B, the undersigned notes that although this evidence was not before the ALJ when the decision was issued, Claimant's "(Updated) Supplemental Testing" dated December 7, 2017 stated that his most recent full scale IQ score was 76 (Tr. at 11), and his diagnosis of "borderline intellectual functioning" remained unchanged with no new or additional findings related to symptoms consistent with an "intellectual disorder" or other form of mental retardation or intellectual disability. (Tr. at 15) In short, there remains no justification for reviewing Claimant's mental impairments under Listing 12.05. See generally, Snider v. Colvin No. 6:12–cv–00954, 2013 WL 4880158, at *5 (S.D.W.Va. Sept. 12, 2013) ("[W]here a claimant has submitted additional evidence to the Appeals Council, and the Appeals Council considered that evidence and made it part of the record, this Court must review the record as a whole, including the new evidence, to determine whether substantial evidence supports the Commissioner's findings.").

It is important to note that even if the ALJ had performed an adaptive functioning analysis under Listing 12.05 Paragraph B (12.05B), as discussed *infra*, the ALJ's reconciliation of the conflicting evidence of record did not demonstrate an "extreme" limitation in one or "marked" limitations in two of the four areas of mental functioning as required under Listing 12.05B2; indeed, these requirements are ***identical*** to the requirements under Listing 12.11B.

and pursuit of vocational training was recommended." (Tr. at 26) The ALJ acknowledged that in the follow up treatment notes, Dr. Alderman noted Claimant "was at times not engaged with treatment" and though he had a job, he "hated work because it was boring" which "the therapist further noted the claimant was unsatisfied with his employment and lacked motivation to identify positive attributes of employment or seek alternate employment." (Tr. at 26, 391) Dr. Alderman noted that Claimant reported that he later quit this job and found another job working 25 hours per week; "[a]t this time, records note he did not seem as easily irritated and seemed motivated at work." (Tr. at 26, 392) The ALJ's review of these treatment records indicated that Claimant's mental status exam findings showed he had a restricted affect, but his mood, behavior, and cognitions were all within normal limits. (Tr. at 26) The ALJ noted that Dr. Alderman's treatment notes indicated that Claimant

> was making efforts to improve his social situations, spending time with others, going out in public, and strengthening the few relationships he did have. He reported he got a job at Goodwill but did not like it because it was boring [Tr. at 399-400]. At his last documented visit, his diagnosis was modified to schizoid personality disorder based on social deficits and mini mental status exam [Tr. at 423-424]. (Id.)

The ALJ reconciled the evidence, specifically noting Claimant's educational records, including his full scale IQ score of 68 during school and compared it with his more recent full scale IQ score of 72, his reading, spelling and math levels, and also his history of attempting to work at several jobs and further noting that "he quit working each job, including the Goodwill rehabilitation training, because he was bored or did not like the job." (Tr. at 27) With respect to Claimant's alleged deficits in self-care, the ALJ noted that "[c]ontrary to much of his testimony, the claimant told the evaluating psychologist that he is independent in his self care, visits his cousin to play video games, engages in sport activities, and watches YouTube videos." (Id.) The ALJ

further noted that the record demonstrates "social difficulties", however, Claimant "has stated he hangs out with friends and he testified he plays basketball fairly frequently. All this indicates the claimant has borderline intellectual functioning and his social skills are sufficient to deal with individuals with whom he has become familiar such as supervisors and coworkers." (Id.)

Clearly, the ALJ's written decision included a discussion and comparison of Claimant's abilities and deficits in all the relevant areas to assess his adaptive functioning espoused in Hardway v. Colvin and its progeny. The ALJ provided "a narrative discussion describing how the evidence support[ed] [her] conclusion." Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015). Although Claimant ostensibly disagrees with the ALJ's determination that he was less impaired in the four areas of mental functioning, this Court cannot disturb those findings when they are supported by substantial evidence, even if this Court were to make a different determination.[13] See generally, Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012).

In sum, the ALJ performed an appropriate and sufficient adaptive functioning analysis by comparing the evidence of record under Listing 12.11 requirements described *supra*; Claimant did not satisfy each requirement under the Listing. Accordingly, the undersigned **FINDS** that the

---

[13] With respect to paragraph A criteria under Listing 12.11, the academic records demonstrate that Claimant had "significant difficulties learning and using academic skills" as evidenced in his IEP requiring a modified curriculum for math, reading and writing; at some point during high school Claimant received "one-on-one specialized instruction" and that "comprehension is his greatest area of weakness." (Tr. at 301) Further, despite some progress in the academic setting, there is no question that Claimant's capabilities remained below average when compared to his peers. Indeed, this evidence is consistent in the medical opinion provided by Dr. Alderman. (Tr. at 382) To the extent Claimant's impairments cause greater limitation in paragraph B criteria, particularly with regard to 12.11B1 and 12.11B3, again, the undersigned might have concluded that the evidence of record demonstrated "marked" limitations, especially in light of Claimant's academic record which clearly required much hand-holding, in addition to his brief, sporadic, nearly nonexistent employment record. Indeed, Claimant seemed incapable of remaining at his Goodwill disability job program for more than two months which involved little more than "just doing training" and "teach[ing] about job skills." In short, though the undersigned deems such evidence demonstrates Claimant's limitations in these areas are "seriously limited" on an independent, appropriate, effective, and sustained basis as defined in 12.00F(2)(d), to the extent that this is essentially reweighing the conflicting evidence of record and therefore foreclosed to the court, it bears mentioning especially in light of the ALJ's step five finding which is discussed *infra*.

ALJ's assessment of the evidence and determination that Claimant's mental impairments did not satisfy the criteria under this Listing at step three in the sequential evaluation process is supported by substantial evidence.

The RFC Assessment and Step Five:

Residual functional capacity represents the *most* that an individual can do despite his limitations or restrictions. See Social Security Ruling 96-8p, 1996 WL 3744184, at *1 (emphasis in original). The Regulations provide that an ALJ must consider all relevant evidence as well as consider a claimant's ability to meet the physical, mental, sensory and other demands of any job; this assessment is used for the basis for determining the particular types of work a claimant may be able to do despite his impairments. 20 C.F.R. § 416.945(a). The RFC determination is an issue reserved to the Commissioner. See Id. § 416.927(d)(2).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physician's opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

Claimant states that there is a conflict between the ALJ's controlling RFC and the medical opinion provided by Dr. Alderman (ECF No. 15 at 15): the ALJ provided that Claimant "requires hands on demonstration of tasks and repetition of instructions throughout the first one to two days on a new job" (Tr. at 24) whereas Dr. Alderman opined that Claimant would need a more restrictive and supportive environment:

> [Claimant's] pattern of strengths and weaknesses demonstrates that he would function best in a highly structured environment with predictable, explicitly delineated expectations, performing tasks, which are quantifiable and repetitive. He would benefit from a job coach who models tasks for him and provides concrete

26

feedback. He would not function well in a high stress environment requiring critical thinking or rapid judgment. In any occupational setting, he will require regular supervision and positive reinforcement.[14]

(Tr. at 382-383) Indeed, the vocational expert testified that an individual who would need repeated instructions beyond the first two days of work "would get to the range of accommodated work or special supervision." (Tr. at 88)

The question before this Court is whether the hypothetical questions posed to the vocational expert "fairly" accommodated Claimant's mental impairments, specifically with respect to the limitation to "hands on demonstration of task and repetition of instructions throughout the first one to two days on a new job." Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989) The record shows that Dr. Alderman, who rendered her opinion in April 2015, psychologists with her office continued to provide counseling services for Claimant throughout the relevant period. It is notable that during this time, several notations regarding Claimant's work attempts also involved his therapist's assisting him with having realistic job expectations as well as helping him identify his capabilities. (Tr. at 392, 400, 401, 402, 423)

The ALJ's RFC assessment restricting Claimant to only those jobs involving "simple, routine, repetitive tasks" requiring simple work-related decisions has support in the medical opinion evidence. However, the limitation that Claimant have "occasional" interaction with supervisors does not have the support of either the opinion evidence or the other relevant evidence of record. For instance, Claimant's academic record is clear that he only progressed with a "one

---

[14] As stated *supra*, although this evidence was not before the ALJ, this opinion remained consistent, if not *verbatim*, as of December 7, 2017. (Tr. at 16) His treating psychologists opined further that Claimant "should receive supportive services as he seeks employment, including help with writing CVs and completing job applications, preparing for interviews, training for work roles and work-related behaviors, and discussing ***reasonable accommodations with employers***." (Id.) (emphasis added)

on one" accommodation that is inconsistent with just one or two days of hand-on demonstration of tasks and repetition of instructions. (Tr. at 301) Claimant worked only two months at the Goodwill's "disability program". (Tr. at 25, 76) Claimant does not drive because he could not pass the written test after three attempts, thereby rendering him dependent upon others to take him to his appointments and/or to work. (Tr. at 25) Claimant's aunt manages his money for him. (Id.) Although the ALJ acknowledged that Claimant worked for McDonald's for a week, she also noted that he "had trouble following directions and although his employers tried to talk to him to do better, he had problems with this and he spent most of his time not talking with other people." (Id.) Indeed, this is corroborated by the medical evidence of record. (Tr. at 384, 385, 390, 392, 393, 395, 396, 400, 423)

It is noted that the ALJ found Claimant had moderate limitations in interacting with others, based on Claimant's reported difficulties in getting along with others, however, because he regularly socialized with his friends and family, the ALJ ultimately concluded that Claimant had the social skills sufficient to "deal with individuals with whom he has become familiar such as supervisors and coworkers." (Tr. at 23) The undersigned appreciates the RFC assessment that appears to accommodate this Claimant's moderate limitations in interacting with others to having only occasional contact with supervisors, however, it appears that the record of evidence demonstrates that more "regular" or frequent contact with a supervisor is more appropriate, especially in light of Claimant's need for hand-on demonstration of tasks and repetition of instructions that would go beyond the first two days on a new job. The evidence concerning Claimant's one-week employment at McDonald's suggests that only two days of receiving hands-on instruction is inadequate.

In short, the undersigned **FINDS** that substantial evidence does not support the RFC assessment with respect to the limitation that Claimant "requires hands on demonstration of tasks and repetition of instructions throughout the first one to two days on a new job." The undersigned further **FINDS** that as a result of the flawed RFC determination, the ALJ failed to carry her burden of proof at the fifth and final step that there are jobs that exist in significant numbers in the national economy that Claimant can perform, particularly those outside of "the range of accommodated or special supervision." McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983).

## Recommendations for Disposition

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **GRANT** the Claimant's request for remand (ECF No. 15) to the extent that the ALJ's RFC assessment and fifth step findings are unsupported by the substantial evidence, **DENY** the Defendant's request to affirm the final decision (ECF No. 16), **REVERSE** the final decision of the Commissioner, and **REMAND** this matter back to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further administrative proceedings for the reasons stated above.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is

made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Chambers, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: August 24, 2018.

Omar J. Aboulhosn
United States Magistrate Judge